IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

KEVIN B. McCARTHY, *et al.*,
Plaintiffs, Counterclaim Defendants-Appellants,

and

LANGSENKAMP FAMILY APOSTOLATE, *et al.*,
Counterclaim Defendants-Appellants,

v.

PATRICIA ANN FULLER, *et al.*,
Defendants, Counter Claimants-Appellees.

On Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division
Case No. 1:08-cv-00994-WTL-DML
Honorable William T. Lawrence, United States District Judge

**BRIEF BY THE HOLY SEE AS *AMICUS CURIAE***

Jeffrey S. Lena
LAW OFFICE OF JEFFREY S. LENA
1152 Keith Avenue
Berkeley, California 94708
Telephone: (510) 665-1713

Byron H. Done
LAW OFFICE OF BYRON H. DONE
1640 10th Avenue
San Francisco, California 94122
Telephone: (925) 518-0449

Alexis Haller
LAW OFFICE OF ALEXIS HALLER
14241 NE Woodinville-Duvall Rd. #113
Woodinville, Washington 98072
Telephone: (425) 487-0730

Attorneys for the Holy See as *Amicus Curiae*

(*Without waiver of sovereign immunity or other jurisdictional immunities*)

## CIRCUIT RULE 26.1   DISCLOSURE STATEMENT

Appellate Court No: 12-2157,-2257,-2262

Short Caption: McCarthy v. Fuller

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R.  App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[✓]   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Holy See, as amicus curiae

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Law Office of Alexis Haller

Law Office of Byron H Done

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

N/A

ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

Attorney's Signature:  s/  Jeffery S Lena          Date: 1/11/13

Attorney's Printed Name:  Jeffrey S Lena

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes**  X   **No** _____

Address:  Law Office of Jeffrey S. Lena, 1152 Keith Avenue, Berkeley, CA 94708

Phone Number:  (510) 665-1713          Fax Number:

E-Mail Address:  jlena@sbcglobal.net

rev. 01/08 AK

# CIRCUIT RULE 26.1   DISCLOSURE STATEMENT

Appellate Court No: 12-2157,-2257,-2262

Short Caption: McCarthy v. Fuller

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[✓]   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Holy See, as amicus curiae

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Law Office of Jeffrey S Lena

Law Office of Byron H Done

(3)   If the party or amicus is a corporation:

   i)   Identify all its parent corporations, if any; and

      N/A

   ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

      N/A

Attorney's Signature:   s/  Alexis Haller          Date: 1/11/13

Attorney's Printed Name:   Alexis Haller

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes**   X   **No** _____

Address:   Law Office of Alexis Haller, 14241 NE Woodinville-Duvall Rd. #113 Woodinville, WA 98072

Phone Number:   (425) 487-0730          Fax Number:

E-Mail Address:   ahaller@ahlawoffice.com

rev. 01/08 AK

**CIRCUIT RULE 26.1   DISCLOSURE STATEMENT**

Appellate Court No: 12-2157,-2257,-2262

Short Caption: McCarthy v. Fuller

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[✓]   PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Holy See, as amicus curiae

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Law Office of Jeffrey S Lena

Law Office of Alexis Haller

(3)   If the party or amicus is a corporation:

i)   Identify all its parent corporations, if any; and

N/A

ii)   list any publicly held company that owns 10% or more of the party's or amicus' stock:

N/A

Attorney's Signature:  s/  Byron H. Done                    Date: 1/11/13

Attorney's Printed Name:  Byron H. Done

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes**  ☒   **No** _____

Address:   Law Office of Byron H. Done, 1640 10th Avenue, San Francisco, CA 94122

Phone Number:  (925) 518-0449                    Fax Number:

E-Mail Address:  byron.done@sbcglobal.net

rev. 01/08 AK

# TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

STATEMENT PURSUANT TO FEDERAL RULE OF
APPELLATE PROCEDURE 29(c)(4)-(5).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.     RELEVANT FACTUAL AND PROCEDURAL BACKGROUND.. . . . . . . . . 4

       A.     Factual and Procedural Background Related to Fuller's Status. . . . . . 4

             1.     General Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

             2.     Fuller's Dismissal from the Sisters of the Precious
                   Blood. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

             3.     Recognition of Fuller's Dismissal by the Bishop of
                   Toledo.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

             4.     Recognition of Fuller's Dismissal by the Holy See.. . . . . . . . . 9

             5.     Fuller's Status in the Parties' Claims and Counterclaims. . . . . 10

             6.     District Court Litigation Involving Fuller's Status. . . . . . . . . . 11

       B.     Factual and Procedural Background Related to Property
           Counterclaims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

             1.     Fuller's Property Counterclaims. . . . . . . . . . . . . . . . . . . . . . . 16

                   a.     General Background. . . . . . . . . . . . . . . . . . . . . . . . . . . 16

                   b.     Alleged Transfer of Money to Plaintiffs and
                       Others. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

                 c.     Alleged Theft of the Latrobe Statue. . . . . . . . . . . . . . . 19

                 d.     Alleged Theft of the Crucifix.. . . . . . . . . . . . . . . . . . . . 20

                 e.     Alleged Theft of the Plaque.. . . . . . . . . . . . . . . . . . . . . 21

f.      Alleged Theft of the Trademarked Medallions. . . . . . . 21

g.      Alleged Theft of the Website. . . . . . . . . . . . . . . . . . . 22

h.      Alleged Trademark Infringement. . . . . . . . . . . . . . . . 22

i.      Alleged Copyright Infringement. . . . . . . . . . . . . . . . 23

2.      District Court Litigation Related to Property
Counterclaims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

a.      Plaintiffs' Answer and First Motion for Partial
Summary Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . 23

b.      Plaintiffs' Petition to the Congregation for Divine
Worship and Related District Court Litigation. . . . . . . 24

c.      The Position of Public Juridic Entities in the
Catholic Church Regarding the Property at Issue. . . . . . 26

III.    ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

A.    The Parties' Claims and Counterclaims Relating to Fuller's
Status Necessarily Implicate Ecclesiastical Governance and
Religious Doctrine. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

1.      Civil Courts Cannot Review a Decision by Religious
Authorities Regarding an Individual's Status Within
the Church. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

2.      The Issue of Fuller's Status, Which Has Been
Definitively Resolved by Church Authorities,
Should Not be Submitted to a Civil Jury. . . . . . . . . . . . . . . 30

a.      To Avoid Interference with the Church's
Internal Governance and Discipline, the
District Court Should Defer to the Decision
of Church Authorities Regarding Fuller's Status. . . . . . 30

b.      If Submitted to the Jury, the Issue of Fuller's Status
Would Impermissibly Require Civil Interpretation
and Evaluation of Religious Doctrine. . . . . . . . . . . . . . 34

c.      While the First Amendment Should Preclude
Fuller's Defamation Counterclaim Based
Upon Her Religious Status, Fuller's State
of Mind Regarding Her Status Remains
Relevant With Respect to Plaintiffs' Fraud
and Deception Claims. . . . . . . . . . . . . . . . . . . . . . . . 35

d.      The Holy See Takes No Position With Regard
to the Proper Procedure to be Utilized in the
District Court Regarding the Status Issue.. . . . . . . . . . 37

B.      Given the Congregation for Divine Worship's Recent
Decision, Plaintiffs' Appeal of the Denial of Their Motion
to Stay is Moot. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

C.      Resolution of Fuller's Counterclaims Does Not Require
Determination of Religious Doctrine. . . . . . . . . . . . . . . . . . . . . 39

1.      Legal Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

2.      All of the Property Counterclaims Can be Resolved
Under Neutral Principles. . . . . . . . . . . . . . . . . . . . . . . 42

a.      Resolution of Fuller's Counterclaims Based
Upon the Alleged Theft of Money Does
Not Require Determination of Religious Doctrine. . . . . 42

b.      Resolution of Fuller's Counterclaims Based
Upon the Alleged Theft of the Latrobe Statue
Does Not Require Determination of Religious
Doctrine. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

c.      Resolution of Fuller's Counterclaim Based
Upon the Alleged Theft of the Website Does
Not Require Determination of Religious Doctrine. . . . . 43

d.      Resolution of Fuller's Counterclaims Based Upon
Trademark Infringement Does Not Require
Determination of Religious Doctrine. . . . . . . . . . . . . . 43

e.      Resolution of the Remaining Property Disputes
Does Not Require Determination of Religious
Doctrine. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

i.      The District Court Can Resolve the Counterclaims Relating to the Crucifix and the Plaque Without Determination of Religious Doctrine. . . . . . . . . . . . . . . . . . . . . . 45

(a)     Because Plaintiffs' Vow of Poverty Defense Fails for Lack of *Jus Tertii* Standing, There is No Need for a Civil Court to Determine Issues of Religious Doctrine. . . . . . . . . . . . . . . . . . 45

(b)     Even Assuming Plaintiffs Had *Jus Tertii* Standing, the District Court Can Adjudicate Counterclaims Related to the Crucifix and Plaque By Relying on Neutral Principles of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

ii.     The District Court Can Resolve the Copyright Counterclaims Without Determination of Religious Doctrine. . . . . . . . . . 48

IV.    CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

V.    CERTIFICATE OF COMPLIANCE. . . . . . . . . . . . . . . . . . . . . . . . . . . 52

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

# TABLE OF AUTHORITIES

## CASES

*Air-Exec, Inc. v. Two Jacks, Inc.*,
 584 F.2d 942 (10th Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Am. Heritage Banco, Inc. v. McNaughton*,
 879 N.E.2d 1110 (Ind. Ct. App. 2008). . . . . . . . . . . . . . . . . . . . . . . . . 36

*Askew v. Trustees of Gen. Assembly of Church of the Lord*
*Jesus Christ of the Apostolic Faith Inc.*,
 684 F.3d 413 (3d Cir. 2012). . . . . . . . . . . . . . . . . . . . 28,29,30,33 n.27,35 n.29

*Bouldin v. Alexander*,
 82 U.S. 131 (1872). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Cannata v. Catholic Diocese of Austin*,
 700 F.3d 169 (5th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*EEOC v. Catholic Univ. of Am.*,
 83 F.3d 455 (D.C. Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35 n.29

*FDIC v. Meyer*,
 781 F.2d 1260 (7th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Gen. Conference Corp. of Seventh-Day Adventists v. McGill*,
 617 F.3d 402 (6th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49,50

*Gonzalez v. Roman Catholic Archbishop*,
 280 U.S. 1 (1929). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33 n.27

*Grede v. Bank of N.Y. Mellon*,
 598 F.3d 899 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Guaranty Bank v. Chubb Corp.*,
 538 F.3d 587 (7th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4 n.1

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
 – U.S. –, 132 S. Ct. 694 (2012). . . . . . . . . . . . . . . . . . . . . . . . 27,28,31,32,35

*Hutchison v. Thomas*,
 789 F.2d 392 (6th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . 28,33 n.27,35 n.29

*Jean v. Dugan*,
  20 F.3d 255 (7th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36 n.30

*Jones v. Wolf*,
  443 U.S. 595 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35 n.29,40,41,47

*Kedroff v. St. Nicholas Cathedral*,
  344 U.S. 94 (1952). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27,29

*Klagsbrun v. Va'ad Harabonim*,
  53 F. Supp. 2d 732 (D.N.J. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar*,
  179 F.3d 1244 (9th Cir. 1999). . . . . . . . . . . . . . . . . 30,32 n.25,46,47,48,49

*Minker v. Baltimore Annual Conference of United Methodist Church*,
  894 F.2d 1354 (D.C. Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37 n.31

*O'Bryan v. Holy See*,
  556 F.3d 361 (6th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Order of St. Benedict v. Steinhauser*,
  234 U.S. 640 (1914). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Petruska v. Gannon Univ.*,
  462 F.3d 294 (3d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37 n.31

*Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*,
  393 U.S. 440 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41,47

*Presbytery of Ohio Valley, Inc. v. OPC, Inc.*,
  973 N.E.2d 1099 (Ind. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Rweyemamu v. Cote*,
  520 F.3d 198 (2d Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29,34

*Scharon v. St. Luke's Episcopal Presbyterian Hosp.*,
  929 F.2d 360 (8th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Schleicher v. Salvation Army*,
  518 F.3d 472 (7th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Schnapper v. Foley*,
    667 F.2d 102 (D.C. Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50 n.40

*Self-Realization Fellowship Church v. Ananda Church of Self-Realization*,
    206 F.3d 1322 (9th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Serbian E. Orthodox Diocese v. Milivojevich*,
    426 U.S. 696 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27,29,33 n.27

*Serbian Orthodox Church Congregation v. Kelemen*,
    256 N.E.2d 212 (Ohio 1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40 n.34

*Singleton v. Wulff*,
    428 U.S. 106 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Soc'y of the Holy Transfiguration Monastery, Inc. v. Archbishop Gregory of Denver*, 685 F. Supp. 2d 217 (D. Mass. 2010). . . . . . . . . . . . . . . . . 50 n.40

*Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*,
    689 F.3d 29 (1st Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49,50

*Specialty Measurements, Inc. v. Measurement Sys., Inc.*,
    763 F. Supp. 91 (D.N.J. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45 n.38

*Tomic v. Catholic Diocese of Peoria*,
    442 F.3d 1036 (7th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27,28

*Transaero, Inc. v. La Fuerza Aerea Boliviana*,
    30 F.3d 148 (D.C. Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Vann v. Guildfield Missionary Baptist Church*,
    452 F. Supp. 2d 651 (W.D. Va. 2006). . . . . . . . . . . . . . . . . . . . . . . . . 31

*Watson v. Jones*,
    80 U.S. 679 (1871). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Young v. N. Ill. Conference of United Methodist Church*,
    21 F.3d 184 (7th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30,33 n.27

*Youngblood v. Superintendent*,
    3:09-CV-283 JVB, 2010 WL 2854263 (N.D. Ind. July 16, 2010). . . . . . . . . . 39

## OTHER AUTHORITIES

1983 CODE OF CANON LAW c.360. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

1983 CODE OF CANON LAW c.361. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Costituzione Apostolica Pastor Bonus* (June 28, 1988),
   80 ACTA APOSTOLICA SEDIS 841-930 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . 1

6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION
   § 31:158-60 (4th ed. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46 n.38

RESTATEMENT (SECOND) OF TORTS § 895 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . 45

## STATEMENT PURSUANT TO FEDERAL RULE OF APPELLATE PROCEDURE 29(c)(4)-(5)

The Holy See is a recognized foreign sovereign. *O'Bryan v. Holy See*, 556 F.3d 361, 372-74 (6th Cir. 2009). The Congregation for Divine Worship and Discipline of the Sacraments of the Apostolic See ("Congregation for Divine Worship") is a dicastery – or department – of the Roman Curia. *See* 1983 CODE OF CANON LAW c.360 (stating that congregations are part of the Roman Curia); *see also Costituzione Apostolica Pastor Bonus* (June 28, 1988), 80 ACTA APOSTOLICA SEDIS 841-930 (1988), arts. 62-70. As such, the Congregation for Divine Worship is part of the sovereign itself. *See* 1983 CODE OF CANON LAW c.361 (stating that constituent elements of the Holy See include "institutes of the Roman Curia"); *see also*, *e.g.*, *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 153 (D.C. Cir. 1994).

On September 5, 2012, this Court invited the Congregation for Divine Worship to submit an *amicus curiae* brief in the above-captioned matter addressing "whether, in its opinion, the resolution of the specific claims or defenses raised in this civil dispute between the parties require a determination of Roman Catholic religious doctrine." Noting its appreciation for the opportunity to express its views on matters implicating important First Amendment principles, and without waiver of sovereign immunity or other jurisdictional immunities, the Holy See responds to the Court's invitation with this *amicus* brief.

This brief does not advocate in the interests of any party to this case and takes no position regarding the merits of the underlying dispute. The Holy See submits the *amicus* brief solely to assist the Court.

1

No party or party's counsel authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief. No person contributed money that was intended to fund preparing or submitting this brief.

# I.    INTRODUCTION

This case would present a challenge for any district court.  The district court docket contains nearly 600 entries totaling over 11,000 pages.  There is a wide range of claims and counterclaims, and the factual issues are complex.  Unfortunately, as the district court has lamented, the parties and their counsel also regularly accuse each other of misconduct, and the documents filed are unusually acrimonious.  There is nothing simple about the management of the litigation below.

However, once the "noise" in the district court litigation is tuned out, the First Amendment issues emerge clearly.  The question posed by this Court in its invitation to file an *amicus* brief was whether "the resolution of the specific claims or defenses raised in this civil dispute between the parties require a determination of Roman Catholic religious doctrine."  The Holy See's response falls into two broad categories.

First, with respect to the issue of Defendant Patricia Fuller's status in the Catholic Church, the Holy See respectfully submits that the district court erred in holding that the issue should be submitted to a jury.  Fuller's status in the Church was resolved thirty years ago by the competent ecclesiastical authorities, and that decision must be accepted by a civil court under established First Amendment principles.  To do otherwise would interfere with the internal governance of the Church and impermissibly require determination of religious doctrine by a civil court.

Second, under the specific circumstances of this case, the claims and counterclaims involving property disputes between the parties can be resolved under neutral principles of law.  The district court need not determine issues of religious

doctrine with regard to such claims, and indeed is prohibited from doing so by the First Amendment. Moreover, in light of the Congregation for Divine Worship's recent denial of Plaintiff Kevin McCarthy's petition, there is no need to consider whether a stay of district court proceedings is necessary under the First Amendment.

## II.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

This factual and procedural background is largely based upon the record in the district court.[1]

### A.    Factual and Procedural Background Related to Fuller's Status

#### 1.    General Background

The Congregation of the Sisters of the Precious Blood ("Sisters of the Precious Blood") is a Roman Catholic religious order recognized by the Holy See. As is the case in other Catholic religious orders, members of the Sisters of the Precious Blood reside communally in religious houses (also known as cloisters). In 1965, the Holy See approved statutes for a strictly cloistered house for members of the Sisters of the Precious Blood who were principally dedicated to contemplative life. DN 102-2, ID 1838-39. The statutes specified that "[t]he Cloister is part of the Congregation [of the

---

[1] Citations to the district court record are identified by the docket number ("DN") and docket page identifier ("ID"). To the extent the parties have not designated the cited document as part of the record on appeal pursuant to Circuit Rule 10(a), the Holy See respectfully requests that the Court take judicial notice of the relevant portion of the district court record. *See*, *e.g.*, *Guaranty Bank v. Chubb Corp.*, 538 F.3d 587, 591 (7th Cir. 2008) (stating that "a court is of course entitled to take judicial notice of judicial proceedings").

Citations to the appellate record are identified by the docket number ("App. DN") and the internal page number of the document in question.

Sisters of the Precious Blood], not an independent branch." DN 102-2, ID 1840; *see also id.*, ID 1844-45.

Defendant-Counterclaimant Patricia Ann Fuller ("Fuller") – known by her religious name Sister Mary Joseph Therese[2] – entered the contemplative cloister of the Sisters of the Precious Blood in New Riegel, Ohio ("New Riegel cloister"), in December 1965. DN 292-19, ID 6129. Fuller professed perpetual simple vows in the Sisters of the Precious Blood in 1970. DN 102-2, ID 1768.[3]

## 2. Fuller's Dismissal from the Sisters of the Precious Blood

By late 1977, the governing body of the Sisters of the Precious Blood had identified problems at the New Riegel cloister. DN 102-2, ID 1756. On December 8, 1977, Sister Charmaine, the Superior General of the Sisters of the Precious Blood, informed Fuller that Fuller had to take a leave of absence from the cloister for at least one year. DN 102-2, ID 1759; *see also* DN 102-2, ID 1757. Sister Charmaine identified several reasons for the decision, including "[Fuller's] seeming satisfaction with minimum spiritual growth and . . . overconcern for externals and physical comfort and niceness," "efforts to control and dominate over the other members of the community," and "disregard for congregational policies and procedures." DN 102-2, ID 1759.

---

[2] While Fuller was properly known as Sister Mary Joseph Therese until her dismissal from the Sisters of the Precious Blood in 1982, this brief will refer to her as "Fuller" throughout for the sake of convenience.

[3] Religious profession denotes the act of embracing the religious state by taking religious vows of poverty, chastity and obedience.

On December 12, 1977, seven of the Sisters at the New Riegel cloister, including Fuller, submitted a petition to Sister Charmaine for "separation from the Congregation of the Sisters of the Precious Blood." DN 102-2, ID 1761.

On October 28, 1978, the Holy See's Congregation for Religious and for Secular Institutes ("Congregation for Religious") – currently known as the Congregation for Institutes of Consecrated Life and Societies of Apostolic Life ("Congregation for Institutes of Consecrated Life") – rejected the petition to separate. DN 102-2, ID 1765. The Congregation for Religious noted that only three Sisters remained of the seven who had originally requested separation, and found that the number was "too small for a well-formed community." *Id.* The Congregation for Religious also stated that it was not clear that the three remaining Sisters – Sister Mildred Neuzil ("Neuzil"), Sister Mary Florecita, and Fuller – could maintain the convent at New Riegel or support themselves, and found that the proposed constitutions "lack the distinctive charism and way of life required for the approval of a religious institute." *Id.* The Congregation for Religious determined that "[t]aking everything into consideration, therefore, this Sacred Congregation cannot grant you the separate status you request." *Id.* The Congregation for Religious recommended that the three Sisters "remain in the Congregation of the Sisters of the Precious Blood under obedience to [their] Superior General." *Id.* Alternatively, the Congregation for Religious stated that the Sisters could petition for exclaustration[4]

---

[4] A Sister who is exclaustrated remains a member of her religious order but is permitted to live outside of a cloister for a determined amount of time.

for one year, petition another monastery or Congregation "willing to receive you" or "present yourselves to a Bishop willing to accept you under his guidance." *Id.*

On February 4, 1979, Fuller petitioned for a one-year exclaustration. DN 102-2, ID 1768. The Holy See's Congregation for Religious granted the petition on April 6, 1979. DN 102-2, ID 1774. Fuller reapplied for exclaustration the following year, and the petition was once again granted. DN 151-1, ID 2650; DN 102-2, ID 1774.

On April 24, 1981, the Congregation for Religious informed Fuller that an extension of the period of exclaustration would not be granted. DN 102-2, ID 1770. The Congregation for Religious presented Fuller with two options to regularize her status: "1) either to return to the Sisters of the Precious Blood and live fully under obedience to the superior general, 2) or request a dispensation from your vows and separate yourself from your Congregation." *Id.* The Congregation for Religious stated that Fuller had until May 31, 1981, to decide, after which Fuller's superior general would be compelled "to begin action leading to your dismissal." *Id.*

Fuller did not respond to the Congregation for Religious or to similar inquiries from the Sisters of the Precious Blood. DN 102-2, ID 1774-77.

On May 24, 1982, the Community Council of the Sisters of the Precious Blood voted "to request the Sacred Congregation [for Religious] that Sister Patricia Fuller be dispensed from her vows and dismissed from the Congregation of The Sisters of the Precious Blood." DN 102-2, ID 1779; *see also* DN 102-2, ID 1772; DN 151-1, ID 2645. On August 11, 1982, the Congregation for Religious dispensed Fuller from her vows and dismissed her from the Sisters of the Precious Blood. DN 102-2, ID

1781-82.[5]   In a June 8, 1983 letter from the Congregation for Religious to the president of the Sisters of the Precious Blood, the Congregation for Religious stated that Fuller "has not made any recourse, so the case is closed."  DN 102-2, ID 1784.

### 3.    Recognition of Fuller's Dismissal by the Bishop of Toledo

Over two decades later, on February 4, 2008, Bishop Leonard P. Blair of the Diocese of Toledo – the Diocese with jurisdiction over Fostoria, Ohio, where Fuller resides – wrote to Fuller stating that he had "received a number of inquiries, both in writing and by phone, regarding your state of life in the Church."  DN 228-19, ID 4886.[6]  Bishop Blair told Fuller that he felt the need to respond, and provided a draft statement for public dissemination.  *Id.*

On February 8, 2008, Fuller responded to Bishop Blair, arguing that she remained a member of a canonical institute of consecrated religious life.  DN 228-20, ID 4891.   Fuller claimed to have "canonical status as a religious under Papal Authority" and stated that she had never sought dispensation from her permanent vows.   *Id.*   In a follow-up letter to Bishop Blair, Fuller argued that she still lived "a theologically Consecrated Life **in private vow**" and that she remained a member of a religious order under canon law.  DN 228-21, ID 4896-98 (emphasis in original).

On September 11, 2008, Bishop Blair sent Fuller the final version of a statement regarding her canonical status in the Church.  DN 288-5, ID 5946.  Bishop

---

[5] Fuller was dismissed because of "[i]ncorrigible disobedience which persists despite two canonical warnings with the threat of dismissal."  DN 151-1, ID 2645.

[6] The inquiries arose out of the dispute between Plaintiffs and Fuller.  That dispute is described more fully below. *See infra* at 16-23.

Blair emphasized to Fuller that the "statement is not intended to take any position whatsoever with regard to your disputes on other matters with [Plaintiffs] Mr. McCarthy and Mr. Langsenkamp." DN 288-5, ID 5946.

The statement of the Diocese of Toledo recognized that Fuller "is not a member of a canonical institute of consecrated life, having been dismissed from the Society of the Precious Blood community in 1982 after she and two other sisters, now deceased, left the order to live their own contemplative way of life." DN 102-1, ID 1750.

### 4. Recognition of Fuller's Dismissal by the Holy See

On June 21, 2011, the Holy See's Congregation for Institutes of Consecrated Life provided a declaration by Archbishop Secretary Joseph W. Tobin, C.Ss.R., that recognized that Fuller had been dismissed from her religious order in 1982. DN 151-1, ID 2672-73.[7] After recounting the events from the period 1977 to 1982, Archbishop Tobin's declaration stated that the Congregation for Institutes of Consecrated Life "attests that Miss Patricia Ann Fuller is not a member of any religious Institute, formally recognized by the Catholic Church." DN 151-1, ID 2673.

On March 26, 2012, the Holy See's Apostolic Nunciature in Washington,

---

[7] As stated above, the Congregation for Religious – the department of the Roman Curia that dispensed Fuller from her vows and dismissed her from the Sisters of the Precious Blood – is now named the Congregation for Institutes of Consecrated Life. Archbishop Tobin's declaration was provided in response to a written request submitted by Plaintiff McCarthy. *See* DN 151-1, ID 2664-65.

D.C.,[8] issued a verbal note affirming the authenticity of Archbishop Tobin's declaration and requesting "that the United States of America and its courts accord full faith and credit to the Declaration." DN 315-2, ID 6817.

### 5.    Fuller's Status in the Parties' Claims and Counterclaims

Both Plaintiffs and Defendants place Fuller's religious status at issue.

Plaintiffs' allegation that Fuller misrepresented her status as a nun and the status of her residence as a convent underlies five of their claims. *See* DN 26, ID 180, 188-90.[9]

Fuller places her status at issue in her defamation claim, where she alleges that the Plaintiffs defamed her by describing her as a "fake nun." DN 65, ID 961. While the district court dismissed on summary judgment most of Fuller's alleged defamatory statements,[10] twelve of the remaining alleged defamatory statements involve Fuller's status as a nun. *See* DN 187-3, ID 3509-13, 3536-39 (Statement Nos. 4-6, 9, 12-14,

---

[8] The Apostolic Nunciature is the Holy See's diplomatic mission in the United States.

[9] In their claims and counterclaims, the parties have largely cast the issue as whether or not Fuller is a "nun." DN 26, ID 180, 188; DN 65, ID 961. For the purposes of this brief, the Holy See will not accord significance to any distinction between the terms "nun" and "sister." Because Fuller was neither a nun nor a sister in the Catholic Church once she was dispensed from her religious vows and dismissed from her religious order on August 11, 1982, any such distinction is immaterial to the case.

[10] *Cf.* DN 355, ID 7394-99; *see also* DN 187-3, ID 3508-53 (Fuller initially identifying 115 alleged defamatory statements)

76-77, 80, 82-83).[11]

###### 6. District Court Litigation Involving Fuller's Status

On February 19, 2010, Plaintiffs moved for partial summary judgment on their fraud, deception, theft and criminal conversion claims on the basis that the indisputable evidence proved that Fuller "made misrepresentations to Plaintiffs regarding her status as a Catholic nun and her operation of a 'Catholic convent.'" DN 73, ID 1109. Plaintiffs relied upon the declaration of Sister Nancy Mathias, a member of the Order of St. Ursula and a representative of the Bishop of Toledo on matters of religious and consecrated life within the Diocese. DN 74-1, ID 1131.

In opposition to Plaintiffs' motion, Fuller submitted a declaration stating that it was her "understanding" that "we were authorized by the order of the Precious Blood to separate" and that the contemplative sisters at New Riegel had "never received a reply to our petition [to separate] from the Vatican." DN 94-17, ID 1440-41. Fuller further claimed that she professed "private vows" on February 11, 1979, and that she therefore "remain[ed] a permanently professed religious sister of the Catholic Church, in private vow, to the present day." *Id.*

On reply, Plaintiffs submitted documents that they had recently received from the Sisters of the Precious Blood detailing the events from 1977 to 1983. DN 102,

_____

[11] Plaintiffs also assert defamation and intentional infliction of emotional distress claims, but neither implicates any First Amendment issue. *See* DN 26, ID 181-87. To the extent that Plaintiffs contend that the claims implicate religious issues because of underlying statements relating to Plaintiffs' alleged theft of property, the analysis with regard to such claims should be identical to the property counterclaims analysis set forth below. *See infra* at 39-50.

ID 1675-76. Plaintiffs also argued that Sister Mathias' "statements regarding Fuller's religious status are binding" on the district court because she was a representative of Bishop Blair of the Diocese of Toledo. *Id.* at 1678.

On June 3, 2010, the district court denied Plaintiffs' motion for partial summary judgment on the basis that it would not have resolved any claim or defense in its entirety and therefore was not "an efficient use of the Court's time." DN 119, ID 2136.

On July 23, 2011, Plaintiffs requested judicial notice of facts related to Fuller's status. Relying upon the Congregation for Institutes of Consecrated Life's authentication of documents from 1977 to 1983, as well as the declaration of Archbishop Tobin discussed above, Plaintiffs requested that the district court take judicial notice of the following facts:

    a.    Fuller is not currently a member of any religious institute formally recognized by the Catholic Church and has not been since her dismissal from the Congregation of the Sisters of the Precious Blood on August 11, 1982.

    b.    Fuller must not present herself as a Sister of the Roman Catholic Church.

    c.    By letter dated October 28, 1978, the Congregation denied the request by the Contemplative Community of the Sisters of the Precious Blood, which included Fuller, for separation from the Congregation of the Sisters of the Precious Blood.

    d.    Any private vows professed by Fuller are invalid and do not make her a member of any religious institute formally recognized by the Catholic Church.

DN 151, ID 2630.[12]

In opposing Plaintiffs' request, Fuller claimed that Archbishop Tobin's declaration was "fraudulent." DN 157, ID 2688.[13] Fuller also argued that the request for judicial notice should be denied because "Canon Law contradicts and invalidates the statements" made in Archbishop Tobin's declaration. *Id.* Fuller contended that because the contemplative cloister "is and always was a Papal Enclosure, *only* His Holiness, Pope Benedict XVI, can discontinue Sister's Cloister." DN 157, ID 2689 (emphasis in original); *see also id.*, ID 2697-2698, 2702-08 (arguing against Archbishop Tobin's declaration on the basis of canon law).

The district court denied Plaintiffs' request for judicial notice. DN 268. The district court stated:

> With all due respect to Archbishop Tobin, the Court does not believe that judicial notice is appropriate in this instance. While the Plaintiffs argue that "[t]he Catholic Church's decision cannot be one subject to dispute," the fact is that the Plaintiffs have not demonstrated that the Catholic Church has made a "decision" regarding Fuller's status. Indeed, the Plaintiffs have not demonstrated that Archbishop Tobin or the Congregation has the authority to make any such "decision," or even that Archbishop Tobin has the authority to speak on behalf of the Congregation. In fact, in their initial Request the Plaintiffs give the Court no information at all regarding what the Congregation is or what Archbishop Tobin's role is within the Congregation.

_____

[12] Emphasis is added, and citations and internal quotations are omitted, throughout this brief, except as otherwise indicated.

[13] The claim by Fuller's counsel that Archbishop Tobin's declaration is "fraudulent" – a claim repeated in this Court (App. DN 9, at 9) – is only one of many unfortunate instances in this case in which the attorneys for the parties make inflammatory assertions that do not advance the proceedings. The district court has repeatedly admonished counsel for both sides to conduct the litigation in a more constructive and cordial fashion. *Cf.* DN 553, ID 11127-28; DN 190.

13

DN 268, ID 5589. The district court also noted that Plaintiffs had not explained "the process by which the Congregation [for Institutes of Consecrated Life]" would determine whether someone was a Catholic nun, or demonstrated "that the applicable process was followed with regard to the Declaration [of Archbishop Tobin]." *Id.*

On February 10, 2012, Plaintiffs moved for partial summary judgment on Fuller's counterclaims, requesting that the district court "[r]ecognize[] and adopt[] the position of the Catholic Church that on August 11, 1982, Fuller ceased being a member of the Precious Blood Sisters and that, since that time, Fuller has not been a member of any religious institute formally recognized by the Catholic Church." DN 226, ID 4692; *see also* DN 227, ID 4711-13.

Plaintiffs also filed a renewed request for judicial notice of the same facts set forth in Plaintiffs' original request. DN 317, ID 6824-25. The second request was supported by a verbal note from the Apostolic Nunciature to address the concerns previously raised by the district court. *Id.*, ID 6822-24; *see also supra* at 9-10.

In response, Fuller reiterated her previous canonical arguments asserted in opposition to Plaintiffs' first request for judicial notice. DN 388, ID 7925-34.

The district court again denied Plaintiffs' request for judicial notice. DN 429. The district court held that Fuller's dismissal from her religious order was not binding on civil courts because "[n]o 'internal dispute' has been 'adjudicated' with regard to Fuller's status within the Catholic Church." DN 429, ID 8759. The district court also concluded that "because the Catholic Church is not a party to this case, and nothing that happens in this case will affect Fuller's relationship with or rights vis-a-vis the

Catholic Church, the Court does not believe that the Constitution is implicated by any ruling or finding in this case. In other words, if the jury ultimately decides that Fuller is a Catholic nun, that decision simply will not affect the Catholic Church in any way." *Id*. Finally, the district court held that the requirements of Federal Rule of Evidence 201 had not been satisfied, including because the declaration of Archbishop Tobin "was made at the request of Plaintiff Kevin McCarthy in response to what can charitably be referred to as a rather one-sided request." *Id*.[14] Expressing concern that there was no indication that Archbishop Tobin was aware of the relevant facts with regard to the private vow issue, the district court concluded:

> This, coupled with the fact that the determinations set forth in the Declaration were not made as a result of an adjudication made for religious or church governance purposes, but rather as a result of a request from a private litigant for litigation purposes based – to what extent it is not clear – on information from (and argument by) that private litigant, leads the Court to that [sic] the Plaintiffs have not demonstrated that judicial notice is appropriate in this instance.

*Id.*, ID 8760.[15]

Plaintiffs appealed the district court's denial of their renewed request for judicial notice. DN 431.

---

[14] In his letter to the Congregation for Institutes of Consecrated Life, McCarthy accused Fuller of making a "fraudulent claim of being a religious sister consecrated by vows" and alleged that Fuller "has perpetrated countless delicts disrupting the fruitful, licit and proper evangelization activities of both clerical and lay faithful promoting the Marian devotion to 'Our Lady of America.'" DN 151-1, ID 2665.

[15] The district court's decision also effectively denied Plaintiffs' motion for partial summary judgment. *Cf.* DN 355, ID 7390; *see also id.*, ID 7396.

**B.** **Factual and Procedural Background Related to Property Counterclaims**

Fuller asserts a range of counterclaims against Plaintiffs related to disputes over personal property. Because the First Amendment analysis differs depending upon which property counterclaim is at issue, this brief will provide background information with regard to each item of property separately. *See*, *e.g.*, *Klagsbrun v. Va'ad Harabonim*, 53 F. Supp. 2d 732, 739 (D.N.J. 1999), *aff'd without opinion*, 263 F.3d 158 (3d Cir. 2001) (stating that the First Amendment inquiry "turns on the specific elements of the inquiry itself and the degree to which it might trench upon doctrinally sensitive matters, rather than on conclusory labeling of the whole dispute as either 'secular' or 'ecclesiastical'").

**1.** **Fuller's Property Counterclaims**

**a.** **General Background**[16]

Like Fuller, Neuzil was a member of the Sisters of the Precious Blood. DN 65, ID 898-99. Before Fuller joined the Sisters of the Precious Blood in 1965, Neuzil had received a series of revelations of apparitions of the Blessed Virgin Mary as "Our Lady of America." DN 26, ID 178; DN 65, ID 900. Neuzil wrote the revelatory messages in her diary and drew a picture of Our Lady of America. *Id.* Neuzil claimed that she had been told that a statue of Our Lady of America in the likeness of the drawing should be created and placed at the National Shrine of the Immaculate

---

[16] This general background is derived mainly from the parties' operative pleadings, namely Plaintiffs' amended complaint (DN 26) and the Defendants' amended counterclaims (DN 65). The Holy See assumes the truth of the allegations discussed herein solely for purposes of this brief.

Conception in Washington, D.C. *Id.*

Neuzil discussed her revelations with her spiritual director, Archbishop Paul F. Leibold of the Archdiocese of Cincinnati. DN 65, ID 900. Archbishop Leibold caused a number of religious medallions depicting Our Lady of America to be struck. DN 65, ID 901. In addition, Archbishop Leibold commissioned the creation of several Our Lady of America plaques. *Id.*; *see also* DN 94-10, ID 1421. Finally, Archbishop Leibold – who had been made aware of a patron who was offering $2000 for the creation of a statue of Our Lady of America – contacted a sculptor in September 1971 regarding execution of the work. DN 94-10, ID 1421.[17]

Neuzil was dispensed from her vows and left the Sisters of the Precious Blood in 1981. DN 151-1, ID 2647. After her voluntary dismissal from the Sisters of the Precious Blood, Neuzil continued to reside with Fuller. DN 65, ID 902.

In 1989, Neuzil registered her copyright in the diary describing her revelations. DN 65, ID 901. The copyrighted diary contained materials that supplemented the versions of the diary that Neuzil had created in the 1960s and 1970s. *Cf.* DN 125, ID 2181-82.[18]

---

[17] Archbishop Leibold died in June 1972. In a June 1970 letter, Archbishop Leibold stated that "[a]s a personal friend and knowing [Neuzil's] deep inner spirituality and goodness[,] I helped her with some private printing of some material and also in having a medal struck, all strictly as a private devotion. I have never taken any action to promote her devotion publically. . . ." DN 284-1, ID 5759; *see also* DN 284-2, ID 5760.

[18] Neuzil also registered copyrights in 1993 for a song, a painting and a sculpture related to Our Lady of America. DN 65, ID 901; *see also* DN 44-9, ID 663; DN 44-8, ID 662; DN 44-6, ID 660.

In 1993, Neuzil formed "Our Lady of America Center" at Fostoria, Ohio, DN 65, ID 902, and registered the trade name in Ohio. *Id.*

Neuzil died in January 2000. DN 65, ID 902. By her last will and testament, Neuzil's possessions, including her copyrights, were bequeathed to Fuller. *Id.*; *see also* DN 94-18, ID 1449; DN 94-19, ID 1451; DN 44-4, ID 658. After Neuzil's death, Fuller continued to carry on the Our Lady of America devotion. DN 26, ID 179.

In 2003, Fuller registered trademarks for religious medallions, plaques and sculptures related to Our Lady of America. DN 65, ID 903; *see also* DN 44-2, ID 656; DN 56-1, ID 845.

On November 1, 2005, Plaintiffs McCarthy and Langsenkamp met Fuller at her home in Fostoria, Ohio, and offered to help with the Our Lady of America devotion. DN 26, ID 179; DN 65, ID 903. After the initial meeting, Fuller, McCarthy and Langsenkamp began to work together to promote the devotion in different respects. DN 26, ID 180. By December 2007, the parties had a falling out. DN 26, ID 181; DN 65, ID 929. Litigation between the parties ensued.

**b.      Alleged Transfer of Money to Plaintiffs and Others**

Fuller alleges counterclaims relating to her transfer of money to McCarthy and others between 2005 and 2007.

Fuller asserts that, in the early 1990s, the aunt of the late Archbishop Leibold donated bank stock to Neuzil and Fuller (who went by the name "Contemplative Sisters"). DN 65, ID 908; *see also* DN 26-11, ID 271. By 2006, the stock was worth

approximately $1,000,000. DN 65, ID 908.

Fuller claims that McCarthy defrauded and coerced her to provide him with hundreds of thousands of dollars from the sale of the bank stock. Fuller alleges that McCarthy's misrepresentations induced Fuller to provide McCarthy $90,000 to pay for his apartment in Rome. DN 65, ID 907, 943. Fuller also claims that McCarthy convinced her to pay $55,000 to his daughter. DN 65, ID 943. All told, Fuller alleges that McCarthy "swindled an estimated [$750,000]" from her. DN 65, ID 942.[19]

Fuller's allegations related to transfer of money to McCarthy and others underlie Count 5 of her counterclaims, which alleges fraud, theft and conversion. DN 65, ID 941.[20]

### c. Alleged Theft of the Latrobe Statue

Madeline Carbonara, a patron from Latrobe, Pennsylvania, originally purchased the Our Lady of America statue ("Latrobe statue") in the early 1970s. DN

---

[19] As stated above, the Holy See expresses no opinion about the merits of Fuller's allegations.

[20] Many of Fuller's counterclaims, including Count 5, also allege RICO violations. Because the district court has dismissed Fuller's RICO counterclaims, they are not discussed separately herein. *See* DN 382, ID 7767. In any event, the First Amendment analysis related to any RICO theory of recovery would be analogous to that set forth below with regard to Fuller's other theories.

In addition, Fuller asserts counterclaims re-alleging the theft of money or personal property under different theories. *See* DN 65, ID 956-58 (implied breach of contract and unjust enrichment). The First Amendment analysis for those counterclaims is identical to that set forth for Count 5 and the other related property counterclaims.

238-4, ID 5289; DN 94-10, ID 1421.  In 1975, Carbonara transferred the statue to a monastery of the Order of the Discalced Carmelites in Latrobe.  DN 238-4, ID 5289. Carbonara stated that the statue should be held in trust until it could be displayed at the National Shrine.  *Id.*  In 2003, Carbonara informed the Carmelite monastery that she wished to transfer the statue to Fuller.  DN 239-1, ID 5292.  Fuller thereafter took possession of the Latrobe statue.  *Id.*; *see also* DN 65, ID 901, 918.

In November 2005, Fuller provided the statue to McCarthy.  DN 65, ID 933. The parties dispute whether Fuller loaned the statue or gifted it to McCarthy outright. *Compare* DN 65, ID 933 *with* DN 26, ID 180.  By 2008, McCarthy claimed that he had "obtained all right, title, and interest" in the statue.  DN 250-2, ID 5379. McCarthy later donated the Latrobe statue to the Diocese of Pittsburgh.  DN 243-1, ID 5324.

McCarthy's alleged theft of the Latrobe statue underlies Count 1 of Fuller's counterclaims.  DN 65, ID 933-35.[21]

### d.    Alleged Theft of the Crucifix

Fuller alleges a counterclaim related to a crucifix that "had been imported from Italy and had once hung in the [New Riegel] convent."  DN 65, ID 948.  Fuller claims that she had loaned the crucifix to counterclaim-defendant Larry Young in 2001.  *Id.* Fuller alleges that McCarthy improperly obtained the crucifix in January 2007 and

---

[21]  Fuller also alleges four counterclaims related to McCarthy's alleged fabrication of a "counterfeit" Our Lady of America statue.  *See* DN 65, ID 935-41, 960 (Counts 2 through 4 and 16).  Such counterclaims fall within the trademark and copyright analysis below.

has since refused to return it to her.  *Id.*, ID 948-49.

In July 2008, McCarthy claimed that Fuller had freely gifted him the crucifix and that he had thereby "obtained all right, title and interest" thereto.  DN 250-2, ID 5379; *see also* DN 243-2, ID 5327.  In October 2008 – after Plaintiffs had filed suit against Fuller – McCarthy gifted the crucifix to his spiritual director, Bishop David L. Ricken of the Diocese of Green Bay.  DN 243-2, ID 5326.

McCarthy's alleged theft of the crucifix underlies Count 8 of Fuller's counterclaims.  DN 65, ID 948-49.

### e.    Alleged Theft of the Plaque

Fuller claims that she transferred temporary custody in a hand-carved plaque of Our Lady of America to Plaintiff Langsenkamp in November 2006 for display at a conference of Catholic bishops in Baltimore.  DN 65, ID 944.[22]  Fuller alleges that Langsenkamp and McCarthy thereafter refused to return the plaque.  *Id.* at 944-45.

In 2008, McCarthy claimed that Fuller had given him the plaque and that he had thereby "obtained all right, title and interest" thereto.  DN 250-2, ID 5379.

McCarthy and Langsenkamp's alleged theft of the plaque underlies Count 6 of Fuller's counterclaims.  DN 65, ID 944-45.

### f.    Alleged Theft of the Trademarked Medallions

Fuller alleges that from November 2005 through December 2007, McCarthy

---

[22] As noted above, Archbishop Leibold had commissioned the creation of two plaques in the late 1960s.  By 2005, both plaques were at Fuller's residence in Fostoria, Ohio, and Fuller alleges that the plaques were her personal property when one was provided to Langsenkamp.  DN 65, ID 944.

and Langsenkamp "absconded with an estimated 10,000 trademarked Our Lady of America religious medallions."  DN 65, ID 950.  Fuller claims that she had paid for the medallions, and that McCarthy and Langsenkamp converted the medallions to their own use and sold them to the public.  *Id.*

McCarthy and Langsenkamp's alleged theft of the medallions underlies Count 9 of Fuller's counterclaims.  DN 65, ID 950-52.

### g.      Alleged Theft of the Website

Fuller alleges that on November 27, 2006, Langsenkamp fraudulently obtained the "domain keys" to the website www.ourladyofamerica.com.  DN 65, ID 945-46.  Fuller claims that Plaintiffs subsequently seized control of the website and used it to solicit donations for their own use.  *Id.*, ID 946.

In December 2007, Langsenkamp wrote to Fuller that the website and associated records "belong to me."  DN 236-2, ID 5272.  In the course of the district court litigation, Langsenkamp affirmed in an affidavit that neither Fuller nor "any other third party" had "any ownership rights in the website."  DN 293-7, ID 6170.

McCarthy and Langsenkamp's alleged theft of the website underlies Count 7 of Fuller's counterclaims.    DN 65, ID 945-47.

### h.      Alleged Trademark Infringement

Fuller registered trademarks for various items in 2003.  *See supra* at 18.  Fuller alleges trademark infringement counterclaims, including counterclaims based upon the sale of medallions, the use of the website to sell religious items, and the creation and use of a counterfeit statue.  *See* DN 65, ID 935-39, 945-47, 950-54 (Counts 2-3,

7, 9 and 11).

### i.    Alleged Copyright Infringement

Fuller asserts a copyright infringement counterclaim based upon Plaintiffs' public distribution of Neuzil's diary via their website.  DN 65, ID 954-56 (Count 12).[23]

### 2.    District Court Litigation Related to Property Counterclaims

### a.    Plaintiffs' Answer and First Motion for Partial Summary Judgment

In their answer to Fuller's amended counterclaims, Plaintiffs never asserted as a defense that the First Amendment precluded adjudication of the property counterclaims.  *See* DN 125, *passim*.  Instead, Plaintiffs affirmatively relied on religious doctrine – the vow of poverty taken by Neuzil – to assert that Fuller had no ownership rights as a matter of civil law.  *See* DN 125, ID 2312.

In their first motion for partial summary judgment, Plaintiffs continued to rely on canon law and religious doctrine to argue that Fuller held no ownership interests in the disputed property under civil law.  *See* DN 74, ID 1114, 1117-18, 1121-22; DN102, ID 1666-69.  The district court rejected Plaintiffs' argument, based in part upon article 113 of the Constitution of the Sisters of the Precious Blood.  DN 119, ID

---

[23] Plaintiffs' fraud and deception claims contain an allegation based upon Fuller's assertion of ownership over the copyrights at issue.  DN 26, ID 180. Plaintiffs also seek declaratory judgment regarding copyright and trademark infringement.  *Id.*, ID 191-92.  The analysis in this brief regarding the copyright and trademark counterclaims applies to Plaintiffs' copyright/trademark-related claims as well.

2135-36.[24]  The district court concluded that "in order to demonstrate that . . . Neuzil did not own the intellectual property rights relating to the writings and art work she created while she was subject to a vow of poverty, the Plaintiffs will have to demonstrate that a legally recognizable transfer of those rights occurred."  *Id.*, ID 2136.  Because no such legally cognizable transfer had been shown, the district court denied Plaintiffs' motion.  *Id.*

### b.  Plaintiffs' Petition to the Congregation for Divine Worship and Related District Court Litigation

On November 12, 2011, more than three years after filing the original complaint in this action, McCarthy petitioned the Holy See's Congregation for Divine Worship.  *See* DN 204-2.  McCarthy's petition argued that property related to Our Lady of America was "public ecclesiastical property" under canon law and requested that the Congregation for Divine Worship "direct" the Archdiocese of Cincinnati to intervene in the federal civil litigation "to vindicate the rights of the Catholic Church, with regard to all the public ecclesiastical goods and sacred objects" at issue in the lawsuit.  DN 204-2, ID 3834, 3849.

On December 28, 2011, Plaintiffs moved the district court to stay the lawsuit until the Holy See ruled upon McCarthy's petition.  DN 204.  Plaintiffs subsequently filed a second motion for partial summary judgment, again requesting that the district court abstain from ruling upon the property claims under First Amendment principles.  DN 227, ID 4713-15.

-----

[24] Article 113 is quoted in full below.  *See infra* at 48.

The district court denied Plaintiffs' motion to stay. DN 326. The district court found that "this case does not implicate the property rights of the Church at all; the Church is not a party to this suit, and thus will not be bound by any decision that may be made here with regard to the ownership of the Items." DN 326, ID 7073. The district court concluded that the property issues "may be decided by application of neutral principles of contract and property law." *Id.*, ID 7074. The district court also determined that there was no "religious controversy" related to the property claims that needed to be resolved by a civil court. *Id.*

On April 24, 2012, the district court ruled on Plaintiffs' second motion for partial summary judgment. DN 355. The district court rejected Plaintiffs' First Amendment argument for the same reasons set forth in the order denying the motion to stay. *Id.*, ID 7391. The district court also resolved several issues related to the property counterclaims based solely upon neutral civil law principles. *Id.*, ID 7399-402.

Plaintiffs appealed the district court's orders on the motion to stay and the second motion for partial summary judgment. DN 400. Defendants, in turn, appealed the district court's summary judgment and RICO orders. DN 440.

On January 7, 2013, the Congregation for Divine Worship denied McCarthy's petition. In its decision directed to McCarthy, the Congregation of Divine Worship stated:

> To this Congregation for Divine Worship and the Discipline of the Sacraments you have addressed a Petition concerning "Our Lady of America", as well as additional materials. The documents you have provided include a Supplemental Petition containing information

regarding a civil action in the United States. Also provided was a draft decree suggesting that this Congregation "instruct" certain dioceses to take actions in the United States, including "intervention" in legal proceedings. This Congregation is also aware of a Verbal Note issued by the Apostolic Nunciature to the United States dated 26 March 2012 and bearing Protocol no. 1196.

More recently, this Congregation received your letters dated 13 November 2012 and 13 December 2012 directed to me in my capacity as Cardinal Prefect.

Based upon the documents provided by you, and information known, this Congregation hereby communicates the **denial** of your Petition.

This Congregation informs you that the matter brought to the attention of the Congregation by your various communications is now definitively concluded.

App. DN 30-2 (emphasis in original).

> ### c. The Position of Public Juridic Entities in the Catholic Church Regarding the Property at Issue

No Catholic Church juridic entity – including the Archdiocese of Cincinnati, the Sisters of the Precious Blood, or the Diocese of Toledo – has ever intervened in the district court action. No such entity has ever asserted a claim to any of the property in question or asserted that Fuller does not enjoy a property interest in the items at issue, whether under canon law or according to religious doctrine.

## III. ARGUMENT

> ### A. The Parties' Claims and Counterclaims Relating to Fuller's Status Necessarily Implicate Ecclesiastical Governance and Religious Doctrine

The parties have each asserted claims or counterclaims touching upon Fuller's Catholic religious status. Because Fuller's status has been definitively resolved by the Church hierarchical authority, the issue should not be adjudicated by a jury.

26

However, there remain other issues related to Plaintiffs' fraud claims that appear properly resolvable by a jury, and Fuller's defamation counterclaim also appears to be subject to adjudication by a trier of fact to the extent that it does not call for a civil court to determine the issue of Fuller's status in the Church.

### 1. Civil Courts Cannot Review a Decision by Religious Authorities Regarding an Individual's Status Within the Church

Under the First Amendment, a civil court's review of a decision by religious authorities relating to an individual's status both intrudes upon ecclesiastical governance and implicates the interpretation of religious doctrine. *See Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1039 (7th Cir. 2006), *abrogated on other ground by Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, – U.S. –, 132 S. Ct. 694 (2012).

First, civil courts may not review the decision of religious authorities relating to an individual's status within a church because to do so interferes with internal matters of ecclesiastical governance and discipline. "[Q]uestions of church discipline and the composition of the church hierarchy are at the core of ecclesiastical concern." *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 717 (1976); *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 115-16 (1952) (stating that "[t]he [*Watson*] opinion radiates . . . a spirit of freedom for religious organizations, an independence from secular control or manipulation, in short, power to decide for themselves, free from state interference, matters of church government"); *Hosanna-Tabor*, 132 S. Ct. at 706 (stating that the Establishment Clause "prohibits government involvement in

such ecclesiastical decisions"); *id.* at 712 (Alito, J., concurring) (stating that "we have long recognized that the Religion Clauses protect a private sphere within which religious bodies are free to govern themselves in accordance with their own beliefs"); *Tomic*, 442 F.3d at 1038 (stating that the First Amendment "cases affirm the fundamental right of churches to decide for themselves, free from state interference, matters of church government"); *Hutchison v. Thomas*, 789 F.2d 392, 393 (6th Cir. 1986) ("The Supreme Court of the United States has steadfastly upheld the First Amendment's command that secular authorities may not interfere with the internal ecclesiastical workings and disciplines of religious bodies").

The prohibition of civil court review of ecclesiastical governance and discipline includes the decisions of religious authorities relating to an individual's status in the religious organization. The First Amendment prohibits a civil court from reconsidering a church's decision as to who is a bishop, a priest, a nun or even a lay member of the religion. *See*, *e.g.*, *Hosanna-Tabor*, 132 S. Ct. at 702 ("Both Religion Clauses bar the government from interfering with the decision of a religious group to fire one of its ministers."); *id.* at 704 (stating that "it is impermissible for the government to contradict a church's determination of who can act as its ministers"); *Bouldin v. Alexander*, 82 U.S. 131, 139 (1872) (holding that "we have no power to revise or question ordinary acts of church discipline, or of excision from membership"); *Askew v. Trustees of Gen. Assembly of Church of the Lord Jesus Christ of the Apostolic Faith Inc.*, 684 F.3d 413, 415 (3d Cir. 2012) ("We conclude that the non-entanglement principle embedded in the Religion Clauses shields [the

hierarch's] membership decisions from civil court review."), *petition for cert. filed*, 81 U.S.L.W. 3291 (U.S. Nov. 14, 2012) (No. 12-624); *Rweyemamu v. Cote*, 520 F.3d 198, 204-05 (2d Cir. 2008) ("Since at least the turn of the century, courts have declined to interfere[ ] with ecclesiastical hierarchies, church administration, and appointment of clergy.") (brackets in original); *see also Kedroff*, 344 U.S. at 115; *Serbian E. Orthodox Diocese*, 426 U.S. at 722-25. Such decisions belong to religious authorities alone.

Second, a civil court cannot evaluate or interpret issues of religious doctrine. *See, e.g.*, *Serbian E. Orthodox Diocese*, 426 U.S. at 709 (stating that "civil determination of religious doctrine" violates the First Amendment); *Watson v. Jones*, 80 U.S. 679, 733-734 (1872) (describing the "evils" that would result if civil courts were to inquire into "the doctrinal theology" of religious denominations); *Kedroff*, 344 U.S. at 116. The prohibition against a civil court's determination or interpretation of religious doctrine is universally recognized in First Amendment jurisprudence. *See, e.g.*, *Schleicher v. Salvation Army*, 518 F.3d 472, 474-75 (7th Cir. 2008); *Askew*, 684 F.3d at 418. The rule precludes a civil court's resolution of disputes of canon law relating to issues of ecclesiastical governance and discipline, including the determination of an individual's status within a religious organization. As the Eighth Circuit has stated:

> Personnel decisions by church-affiliated institutions affecting clergy are per se religious matters and cannot be reviewed by civil courts, for to review such decisions would require the courts to determine the meaning of religious doctrine and canonical law and to impose a secular court's view of whether in the context of the particular case religious doctrine and canonical law support the decision the church authorities

have made. This is precisely the kind of judicial second-guessing of decision-making by religious organizations that the Free Exercise Clause forbids.

*Scharon v. St. Luke's Episcopal Presbyterian Hosp.*, 929 F.2d 360, 363 (8th Cir. 1991); *see also*, *e.g. Askew*, 684 F.3d at 420 ("We are not competent to upset judgments made by [the religious authority] in this doctrinally sensitive area [of excommunication], for there are no neutral principles of law that shed light on the membership composition necessary for the good of the Church."); *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 179-80 (5th Cir. 2012). Indeed, a civil court may not even inquire into the doctrinal basis for such decisions. *See*, *e.g.*, *Young v. N. Ill. Conference of United Methodist Church*, 21 F.3d 184, 186 (7th Cir. 1994) ("In these sensitive areas, the state may no more require a minimum basis in doctrinal reasoning than it may supervise doctrinal content."); *see also Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar*, 179 F.3d 1244, 1247-48 (9th Cir. 1999).

> **2.    The Issue of Fuller's Status, Which Has Been Definitively Resolved by Church Authorities, Should Not be Submitted to a Civil Jury**
>
> > **a.    To Avoid Interference with the Church's Internal Governance and Discipline, the District Court Should Defer to the Decision of Church Authorities Regarding Fuller's Status**

To avoid interference in internal matters of ecclesiastical governance and discipline, the district court should defer to the decision of Church authorities regarding Fuller's status as a nun.

The Catholic Church's hierarchical authority dismissed Fuller from the Sisters

of the Precious Blood nearly thirty years ago. The Community Council of the Sisters of the Precious Blood voted to dismiss Fuller. DN 102-2, ID 1779. The Holy See's Congregation for Religious confirmed the dismissal. *Id.*, ID 1781-82. As of 1983, "the case [was] closed." *Id.*, ID 1784.

Catholic Church authorities have since repeatedly recognized that Fuller had been dismissed from her religious order and was not a member of any recognized Catholic religious order. After investigating the issue, Bishop Blair of the Diocese of Toledo issued a formal statement that recognized that Fuller had been dismissed in 1982. DN 102-1, ID 1750. The Holy See's Congregation for Institutes of Consecrated Life likewise recognized that Fuller had been dismissed and no longer belonged to any recognized religious institute. DN 151-1, ID 2672-73. The Apostolic Nunciature to the United States requested that the Congregation for Institutes of Consecrated Life's declaration be accepted by United States courts. DN 315-2, ID 6817.

This is not, in short, a case in which there is any ambiguity as to what the Church authorities have decided. *Cf. Vann v. Guildfield Missionary Baptist Church*, 452 F. Supp. 2d 651, 655-56 (W.D. Va. 2006) (no deference where "the Church itself has never acted"). The decision was made 30 years ago, and has been recognized as valid by various Catholic Church authorities numerous times since. Under core First Amendment principles, civil courts must defer to ecclesiastical authorities with regard to such a matter of internal governance and discipline. *See supra* at 27-29; *see also*, *e.g.*, *Hosanna-Tabor*, 132 S. Ct. at 710 (discussing the "important" interest of

"religious groups in choosing who will preach their beliefs, teach their faith, and carry out their mission"); *id.* at 713 (Alito, J., concurring) (stating that the "fundamental rights" of religious groups "surely include the freedom to choose who is qualified to serve as a voice for their faith.").[25]

The district court declined to accept the decision of Church authorities "because the Catholic Church is not a party to this case, and nothing that happens in this case will affect Fuller's relationship with or rights vis-a-vis the Catholic Church . . . . In other words, if the jury ultimately decides that Fuller is a Catholic nun, that decision simply will not affect the Catholic Church in any way." DN 429, ID 8759. However, the Holy See respectfully submits that the district court was not sufficiently sensitive to the negative effects that would result from a civil judgment finding that Fuller is a Sister in a recognized religious order within the Catholic Church. If Fuller prevails against Plaintiffs on her defamation counterclaims, she will be able to use the civil judgment to argue that she is, in fact, a Sister in the Catholic Church. Such a result would raise the specter of inconsistent findings between civil and ecclesiastical

---

[25] The district court concluded that it was not bound by the decision of ecclesiastical authorities because those authorities had not "adjudicated" Fuller's status. DN 429, ID 8759-60. However, the First Amendment does not require a religious organization to "adjudicate" an individual's religious status; like any other religious organization, the Catholic Church is entitled to make such determinations by whatever procedure it employs internally. Moreover, the "First Amendment not only precludes a civil court from determining for itself who is entitled to hold religious office, but also precludes it from determining whether the religious organization followed its own ecclesiastical rules." *Maktab Tarighe Oveyssi Shah Maghsoudi*, 179 F.3d at 1247-48.

authorities, and would create a significant danger of confusion among the faithful.[26] By reaching a determination directly contrary to the long-standing decision of the Church regarding Fuller's status, the ruling would interfere with the Church's control over internal governance and discipline in precisely the manner that the First Amendment prohibits. Just as a civil court should not be permitted to find – contrary to religious authorities – that an individual is a bishop, or a priest, or a rabbi, or an imam, or even a member of a Church, the district court below should not be permitted to adjudge that Fuller is a Sister in a recognized religious order in the Church. That is for the Church, and not a civil court, to decide.[27]

---

[26] That is particularly true given Fuller's public profile with regard to the Our Lady of America devotion. *See* http://www.ourladyofamerica.com/index.php.

[27] Citing *Gonzalez v. Roman Catholic Archbishop*, 280 U.S. 1 (1929), Fuller argued below that the decision regarding her status was based upon "fraud, collusion, and arbitrariness." DN 210, ID 4130. To the extent that Fuller claims that the decision was "arbitrary," such an argument is foreclosed by Supreme Court precedent. *Serbian E. Orthodox Diocese*, 426 U.S. at 712-13; *see also Young*, 21 F.3d at 186-87; *Askew*, 684 F.3d at 420. With regard to "fraud" or "collusion," the language in *Gonzalez* was mere *dictum*. *Serbian E. Orthodox Diocese*, 426 U.S. at 712. No decision of the Supreme Court "has given concrete content to or applied the 'exception,'" other than to say that it remained an open question "whether or not there is room for marginal civil court review under the narrow rubrics of "fraud" or "collusion" when church tribunals act in bad faith for secular purposes." *Id.* at 712-13; *see also Young*, 21 F.3d at 187 n.3. Assuming *arguendo* that review is allowed from fraud or collusion, "it is still only allowed for fraud or collusion of the most serious nature undermining the very authority of the decision-making body." *Hutchison*, 789 F.2d at 395. There is no showing whatsoever that such conduct occurred when Fuller was dismissed from her religious order thirty years ago.

**b.** **If Submitted to the Jury, the Issue of Fuller's Status Would Impermissibly Require Civil Interpretation and Evaluation of Religious Doctrine**

There is a second problem with submitting the issue of Fuller's status to the jury: it will result in the impermissible adjudication of issues of Catholic religious doctrine.

Both the decision not to permit Fuller to form a separate religious order and the decision to dismiss Fuller from the Sisters of the Precious Blood were based upon religious doctrine and canon law. The record shows that Fuller's request (made jointly with Neuzil and Sister Florecita) to form a separate religious order was denied in part based upon the "lack [of] the distinctive charism and way of life required for the approval of a religious institute." DN 102-2, ID 1765. Fuller, in turn, was dismissed because of "[i]ncorrigible disobedience which persists despite two canonical warnings with the threat of dismissal." DN 151-1, ID 2645.[28] A civil court cannot review such decisions without wading into matters of religious doctrine and canon law. *See*, *e.g.*, *Rweyemamu*, 520 F.3d at 209 (challenge to decision by Holy See congregation with regard to particular priest "cannot be heard . . . without impermissible entanglement with religious doctrine").

In addition, Fuller's attempt to challenge the long-standing decision relating to her status is based on religious doctrine and canon law. *See*, *e.g.*, DN 157, ID 2688 (Fuller arguing that "Canon Law contradicts and invalidates the statements" made in Archbishop Tobin's declaration); *see also id.*, ID 2689, 2697-2698, 2702-08 (arguing

_____

[28] Disobedience to superiors is a violation of the religious vow of obedience.

34

against Archbishop Tobin's declaration on the basis of canon law); DN 388, ID 7925-34 (same). A civil court lacks the competence to evaluate competing interpretations of religious doctrine and canon law. *See supra* at 29-30. Once again, it is for Church authorities – and not a civil court – to interpret such religious matters with regard to the issue of Fuller's status. As Justice Alito recently explained:

> [T]he mere adjudication of such questions would pose grave problems for religious autonomy: It would require calling witnesses to testify about the importance and priority of the religious doctrine in question, with a civil factfinder sitting in ultimate judgment of what the accused church really believes, and how important that belief is to the church's overall mission.

*Hosanna-Tabor*, 132 S. Ct. at 715 (Alito, J., concurring).[29]

In short, because the issue of Fuller's status in the Church is inextricable from matters of religious doctrine and canon law, it should not be resolved by a civil court.

> c.  **While the First Amendment Should Preclude Fuller's Defamation Counterclaim Based Upon Her Religious Status, Fuller's State of Mind Regarding Her Status Remains Relevant With Respect to Plaintiffs' Fraud and Deception Claims**

While the First Amendment should preclude Fuller's defamation counterclaim

---

[29] As discussed below, Supreme Court jurisprudence permits civil courts to apply "neutral principles" to resolve property disputes. *See infra* at 40-41. The Supreme Court "expressly noted, however, that the 'neutral principles' exception to the usual rule of deference applies only to cases involving disputes over church property." *Hutchison*, 789 F.2d at 396; *see also Jones v. Wolf*, 443 U.S. 595, 599 (1979); *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 465-66 (D.C. Cir. 1996). The "neutral principles" approach "has never been extended to religious controversies in the areas of church government, order and discipline, nor should it be." *Hutchison*, 789 F.2d at 396; *see also Askew*, 684 F.3d at 419-20. The "neutral principles" approach is thus inapplicable to the issue of Fuller's status.

based upon her religious status, Fuller's state of mind regarding her status remains relevant with respect to Plaintiffs' fraud and deception claims.

One of Fuller's twenty-three counterclaims – Count 17, the defamation counterclaim – is based upon the issue of her status in the Church. DN 65, ID 961-62. And with regard to that counterclaim, only some of the statements implicate the status issue; the rest do not implicate Fuller's status and do not appear to pose any First Amendment problem. *Compare* DN 187-3, ID 3509-13, 3536-39 (Statement Nos. 4-6, 9, 12-14, 76-77, 80, 82-83) (implicating Fuller's status) *with id.*, ID 3508-12, 3535-40 (Statement Nos. 1-3, 7, 10-11, 74-75, 78, 81, 84-85) (Fuller's status not implicated). Accordingly, deference to the decision of Church authorities would result in the dismissal of only a portion of Count 17 of Fuller's counterclaims.

Deference to the decision of Church authorities would not compel judgment in favor of Plaintiffs on their fraud and deception claims. *Cf.* DN 26, ID 180, 188-90. There would remain a range of issues to be litigated, including whether misleading statements were made by Fuller, whether Plaintiffs relied upon such statements, and whether Plaintiffs were damaged. *See, e.g., Am. Heritage Banco, Inc. v. McNaughton*, 879 N.E.2d 1110, 1115 (Ind. Ct. App. 2008).[30] Moreover, as the district court correctly noted, Plaintiffs' fraud claim might require that the jury resolve Fuller's state of mind with regard to her religious status. *See* DN 384, ID

---

[30] The parties do not appear to have litigated whether the law of Indiana, Ohio or another state applies to their dispute under Indiana's choice-of-law rules. *Jean v. Dugan*, 20 F.3d 255, 260-61 (7th Cir. 1994). Because it is not clear that the choice of law would make a difference in this case, the Holy See will assume for purposes of this brief that Indiana substantive law applies. *Id.* at 260.

7828.  In other words, Fuller may be entitled to present a defense that she reasonably

believed herself to be a Sister in the Catholic Church, even though she was not in fact

a Sister in the Church.  As long as the district court carefully monitors the proceeding

to ensure that it does not devolve into litigation over Fuller's actual status or involve

the interpretation of religious doctrine,[31] no First Amendment problems should arise

from Fuller presenting a defense based upon her lack of fraudulent intent.

> **d.  The Holy See Takes No Position With Regard to the Proper Procedure to be Utilized in the District Court Regarding the Status Issue**

While the district court must defer to the decision of Church authorities

regarding Fuller's status, the Holy See takes no position regarding the proper

procedure to be utilized with respect to the issue.  In particular, the Holy See does not

express a view as to whether Plaintiffs' requests for judicial notice – particularly as

drafted[32] – should have been granted.  Moreover, the Holy See also acknowledges the

district court's concern with regard to the nature of McCarthy's one-sided inquiry that

preceded the Apostolic Nunciature's verbal note.  *See* DN 429, ID 8759; DN 151-1,

ID 2665.  The district court may have ruled differently had McCarthy requested

initially that the court itself approach the Holy See, or if McCarthy had submitted a

letter to the Congregation for Institutes for Consecrated Life that was copied to

---

[31] *See Minker v. Baltimore Annual Conference*, 894 F.2d 1354, 1360-61 (D.C. Cir. 1990) (discussing a district court's continuing duty to monitor case in order to prevent impermissible entanglements); *see also Petruska v. Gannon Univ.*, 462 F.3d 294, 312 (3d Cir. 2006).

[32] For example, that Fuller "must not present herself as a sister" does not appear to be an adjudicative fact cognizable under Federal Rule of Evidence 201.

Fuller's counsel or the district court.

However, even if the district court's ruling was the result of Plaintiffs' unfortunate litigation choices, the bottom line remains the same: the decision regarding Fuller's status was made thirty years ago (long before the instant case), and has been recognized by the relevant diocesan and Holy See authorities. Under established First Amendment law, the decision must be accepted by the district court. And even if judicial notice is not the appropriate procedure, the constitutional considerations can be protected by other mechanisms – including dismissal of the defamation counterclaims based upon the status issue, a special jury instruction regarding Fuller's status in the Church, and careful monitoring of the trial proceedings to ensure that the issue of Fuller's status does not become a fact determined by a civil jury.

**B.** **Given the Congregation for Divine Worship's Recent Decision, Plaintiffs' Appeal of the Denial of Their Motion to Stay is Moot**

In light of the Congregation for Divine Worship's recent decision, App. DN 30-2, Plaintiffs' appeal of the district court's denial of their motion to stay is moot.

As discussed above, Plaintiffs moved the district court "for an Order staying and/or holding in abeyance further proceedings pending a ruling by the Congregation on the Petition" submitted by McCarthy. DN 204, ID 3825. After the district court denied their motion, DN 326, Plaintiffs filed an appeal. DN 400. In this Court, Plaintiffs continue to press the need to stay district court proceedings pending resolution of McCarthy's petition by the Congregation for Divine Worship. *See* App. DN 7, at 15 ("The issue in this appeal (No. 12-2157) is whether the district court must

recognize the Church's authority to resolve religious doctrinal issues relating to the Devotional items and stay its hand pending that determination.").

On January 7, 2013, the Congregation for Divine Worship denied McCarthy's petition. *See* App. DN 30-2. Given the Holy See's decision, Plaintiffs' appeal regarding their motion to stay is moot. *See FDIC v. Meyer*, 781 F.2d 1260, 1264 (7th Cir. 1986) (stating that "if an event occurs while an appeal is pending that renders . . . a decision unnecessary, the appeal will be dismissed as moot"); *see also*, *e.g.*, *Youngblood v. Superintendent*, 3:09-CV-283 JVB, 2010 WL 2854263, at *4 (N.D. Ind. July 16, 2010) (request for stay pending other proceeding rendered moot when such proceeding is dismissed).

### C. Resolution of Fuller's Counterclaims Does Not Require Determination of Religious Doctrine

Under the specific circumstances of this case, Fuller's property-related counterclaims can be resolved under neutral principles of law.

Nothing in this *amicus* brief should be construed as an endorsement of the neutral-principles approach under different circumstances. Instead, the totality of the following case-specific factors renders the neutral-principles approach appropriate in this case:

1.  The case involves only private parties. No party is a member of the Church hierarchy, a member of a religious order, or a representative of any Catholic public juridic person. Moreover, no Catholic Church entity has sued or is being sued.

2.  No Catholic Church juridic person – such as the Archdiocese of Cincinnati, the Diocese of Toledo or the Sisters of the Precious Blood – has intervened in the district court case or asserted any claim to the property at issue.

3.      The property claims and counterclaims do not implicate issues of ecclesiastical governance or polity.

4.      The property in question had for years been in the possession of a lay person – Fuller – until certain transfers by McCarthy after litigation had already commenced.

5.      Plaintiffs originally filed suit in a civil court. Moreover, Plaintiffs did not raise the First Amendment issue during years of litigation, and affirmatively sought judgment from the civil court based upon religious doctrine and canon law.

6.      Plaintiffs' current claim that the property is owned by Catholic juridic entities is inconsistent with their original position in this litigation, when they claimed that they had full ownership rights in such property.

7.      McCarthy's petition before the Congregation for Divine Worship, which was based on the contention that the property belonged to a Catholic juridic entity, was denied.

Given all of the foregoing circumstances, the property disputes in this case can be properly decided based upon neutral principles.

### 1.      Legal Standard

Under the First Amendment, "a State is constitutionally entitled to adopt neutral principles of law as a means of adjudicating a church property dispute." *Jones*, 443 U.S. at 604.[33] Indiana has adopted a neutral-principles approach to resolve church property disputes. *Presbytery of Ohio Valley, Inc. v. OPC, Inc.*, 973 N.E.2d 1099, 1105, 1106-07 (Ind. 2012), *reh'g denied* (Oct. 23, 2012).[34]

---

[33] By relying on the neutral-principles jurisprudence, the Holy See does not imply that the property at issue here is "church property."

[34] As noted above, the parties do not appear to have raised the issue of which substantive state law applies in this case. In any event, Ohio has also long followed a neutral-principles approach in church property cases. *See, e.g.*, *Serbian Orthodox Church Congregation v. Kelemen*, 256 N.E. 2d 212, 216-17 (Ohio 1970).

The neutral-principles approach recognizes that the "State has an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil forum where the ownership of church property can be determined conclusively." *Jones*, 443 U.S. at 602. As the Supreme Court explained in *Jones*, the neutral-principles approach has certain advantages:

> The primary advantages of the neutral-principles approach are that it is completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity. The method relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges. It thereby promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice. Furthermore, the neutral-principles analysis shares the peculiar genius of private-law systems in general – flexibility in ordering private rights and obligations to reflect the intentions of the parties.

*Jones*, 443 U.S. at 603-04.

There are, however, difficulties that can arise under a neutral-principles approach that require courts to remain vigilant. As the *Jones* Court explained, a civil court examining church documents "must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts." *Jones*, 443 U.S. at 604. That is because "First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice." *Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969); *see also Jones*, 443 U.S. at 602.

The question is whether the neutral-principles approach can resolve Fuller's property counterclaims, or whether adjudication of such counterclaims requires

determination of Catholic religious doctrine.[35]

### 2. All of the Property Counterclaims Can be Resolved Under Neutral Principles

#### a. Resolution of Fuller's Counterclaims Based Upon the Alleged Theft of Money Does Not Require Determination of Religious Doctrine

Fuller alleges that Plaintiffs misappropriated $750,000 through fraud and coercion. DN 65, ID 941; *see also* DN 65, ID 956-58. Plaintiffs nowhere argue that Fuller's counterclaims related to money implicate issues of religious doctrine or canon law. These counterclaims can be resolved applying neutral civil law principles.

#### b. Resolution of Fuller's Counterclaims Based Upon the Alleged Theft of the Latrobe Statue Does Not Require Determination of Religious Doctrine

Fuller received the Latrobe statue in 2003, over twenty years *after* she left the Sisters of the Precious Blood. DN 239-1, ID 5292. The Latrobe statue was given to her by the Carmelite monastery in Latrobe at the request of the patron who originally paid for the statue in the 1970s. *Id.* Because Fuller received the statue long after she was dispensed from her vows and dismissed from her religious order, the determination of the ownership of the Latrobe statue does not implicate matters of canon law or religious doctrine. Fuller's counterclaims based upon the alleged theft of the statue can be readily resolved by a civil court applying neutral principles of

---

[35] Plaintiffs advocate use of the deference approach. However, in light of the Congregation for Divine Worship's recent denial of McCarthy's petition, it is unclear how deference to that Congregation's decision inures to Plaintiffs' benefit.

law.[36]

     **c.**     **Resolution of Fuller's Counterclaim Based Upon the Alleged Theft of the Website Does Not Require Determination of Religious Doctrine**

Fuller alleges that Plaintiffs converted the website www.ourladyofamerica.com to their own use in November 2006. Because the alleged conversion of the website occurred after Fuller was dispensed from her vows and dismissed from her religious order, the counterclaim does not implicate matters of canon law or religious doctrine.

     **d.**     **Resolution of Fuller's Counterclaims Based Upon Trademark Infringement Does Not Require Determination of Religious Doctrine**

In 2003, Fuller registered trademarks for religious medallions, plaques and sculptures related to Our Lady of America. DN 65, ID 903; *see also* DN 44-2, ID 656; DN 56-1, ID 845. Since Fuller registered the trademarks after she was dispensed from her vows and dismissed as a member of a religious order, Fuller's trademark infringement claims do not implicate any religious issues. *See* DN 119, ID 2134 (district court holding that trademark counterclaims do not implicate the vow of poverty because Fuller obtained the trademark in 2003); *see also* DN 65, ID 935-39,

---

[36] In his petition to the Congregation for Divine Worship, McCarthy argued that the Latrobe statue – as well as other items related to Our Lady of America – was a "public ecclesiastical good[]" and a "sacred object" that belonged to the Archdiocese of Cincinnati. As noted above, there is no evidence that the Archdiocese of Cincinnati itself agrees with McCarthy's canon law theory. In addition, the Congregation for Divine Worship denied McCarthy's petition. As a result, this brief need not address McCarthy's canonical theory that the Archdiocese of Cincinnati owns the property.

### e. Resolution of the Remaining Property Disputes Does Not Require Determination of Religious Doctrine

The foregoing leaves only three items of disputed property even *potentially* implicating the religious vow of poverty taken by Neuzil and Fuller when they were members of the Sisters of the Precious Blood: the crucifix, the plaque and the copyright. With regard to the crucifix and the plaque, the record indicates that the items were obtained by the Sisters in the New Riegel cloister during the 1970s. With regard to the copyright, Neuzil created her diary in the 1960s and 1970s; a modified version containing additional materials was registered in 1989.

Plaintiffs argue that the crucifix, the plaque and the copyright were the property of the Sisters of the Precious Blood, and not the property of Fuller, because Fuller and Neuzil were bound by the vow of poverty in the 1960s and 1970s. The question is whether Fuller's counterclaims relating to such property necessarily require determination of religious doctrine in light of that vow.

---

[37] That includes the counterclaim based upon Plaintiffs' alleged misappropriation of the trademarked medallions (Count 9), since the Holy See is not aware of any evidence that the medallions at issue were created when Fuller was a member of the Sisters of the Precious Blood.

### i. The District Court Can Resolve the Counterclaims Relating to the Crucifix and the Plaque Without Determination of Religious Doctrine

#### (a) Because Plaintiffs' Vow of Poverty Defense Fails for Lack of *Jus Tertii* Standing, There is No Need for a Civil Court to Determine Issues of Religious Doctrine

Plaintiffs' vow of poverty argument fails because they lack *jus tertii* standing to assert the property rights of the Sisters of the Precious Blood.

The general rule is that "one who is otherwise liable to another for harm to or interference with . . . a chattel is not relieved of the liability because a third person has a legally protected interest in the . . . chattel superior to that of the other." RESTATEMENT (SECOND) OF TORTS § 895 (1979); *see also*, *e.g.*, *Air-Exec, Inc. v. Two Jacks, Inc.*, 584 F.2d 942, 945 (10th Cir. 1978) ("It is well established as a general proposition of law that a converter of property may not assert an interest in a third party, through whom the converter does not claim title or a right to possession, to defeat an action for conversion."); *cf. Grede v. Bank of N.Y. Mellon*, 598 F.3d 899, 903 (7th Cir. 2010) ("It is a basic principle that litigants can't invoke the rights of third parties."); *Singleton v. Wulff*, 428 U.S. 106, 113 (1976) ("Federal courts must hesitate before resolving a controversy . . . on the basis of the rights of third persons not parties to the litigation."); *see also* DN 326, ID 7072 n.3.[38]  Because Plaintiffs

---

[38] The trademark infringement counterclaims do not implicate religious doctrine for the reason discussed above. *See supra* at 43-44.  However, Plaintiffs also have an identical *jus tertii* standing problem with regard to such counterclaims.  *See*, *e.g.*, *Specialty Measurements, Inc. v. Measurement Sys., Inc.*, 763 F. Supp. 91, 95 (D.N.J. 1991) ("*Jus tertii*, or raising the rights of third parties, should not be allowed

cannot assert the purported property rights of the Sisters of the Precious Blood to defeat Fuller's property counterclaims, the religious vow issue does not need to be resolved by the civil court.[39]

> **(b) Even Assuming Plaintiffs Had *Jus Tertii* Standing, the District Court Can Adjudicate Counterclaims Related to the Crucifix and Plaque By Relying on Neutral Principles of Law**

Assuming *arguendo* Plaintiffs did enjoy *jus tertii* standing, the district court could still adjudicate the dispute relating to the crucifix and the plaque by application of neutral principles of property law. For example, Plaintiffs originally asserted that Fuller had gifted the items to Plaintiffs themselves (DN 250-2, ID 5379-80); that defense remains in Plaintiffs' answer. *See*, *e.g.*, DN 125, ID 2313 ("With regard to the theft and conversion claims, the allegedly stolen items were not owned by Fuller, as she had previously gifted them to McCarthy and others."). The adjudication of that defense turns on the application of neutral principles of law to the facts, and not on religious doctrine. *Cf. Maktab Tarighe Oveyssi Shah Maghsoudi*, 179 F.3d at 1250 (stating that claim involving tortious conversion of books and materials should be

_____

as a defense in any trademark case."); *see also* 6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 31:158-60 (4th ed. 2012).

[39] Even if Plaintiffs did have standing to raise the property rights of the Sisters of the Precious Blood, there would be a host of other issues – including statute of limitations, adverse possession, abandonment and laches – regarding whether such rights could be raised three decades after Fuller and Neuzil left the religious order. That is particularly true given that the record contains no evidence that the Sisters of the Precious Blood have ever asserted any interest in the disputed property during the intervening thirty-year period.

"susceptible to decision by ordinary principles of the law of personal property").

With regard to Plaintiffs' attempt to use the religious vow of poverty, "the First Amendment prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice." *Jones*, 443 U.S. at 602. Under the circumstances of this case, *supra* at 39-40, Plaintiffs should not be entitled to raise the vow of poverty as a defense. *See Maktab Tarighe Oveyssi Shah Maghsoudi*, 179 F.3d at 1250 n.5 ("Defenses that are not secular create the same constitutional difficulties as claims that are not secular."). "To reach those questions would require the civil courts to engage in the forbidden process of interpreting and weighing church doctrine." *Presbyterian Church*, 393 U.S. at 451.

That does not necessarily mean that civil documents executed in view of the vow of poverty will have no role in the district court proceeding. During the time that they were members of the Sisters of the Precious Blood, Neuzil and Fuller may have executed civil documents that created certain legal obligations relating to property rights, such as a waiver of compensation or an assignment of income. If that is the case, such civil documents could potentially be examined under a neutral-principles approach.

However, to the extent that the district court determines that it is necessary to undertake the analysis, it should proceed with caution. *See supra* at 37 n.31 (discussing a court's continuing duty with regard to First Amendment questions). For example, when faced with Plaintiffs' motion for partial summary judgment requesting resolution of issues of canon law related to the vow of poverty, the district

court interpreted article 113 of the Constitution of the Sisters of the Precious Blood. DN 119, ID 2135-36. Article 113 states: "A sister, superiors not excluded, must hand over to the Institute, to which it belongs as common property, anything she may acquire in the Institute by personal industry or in the interests of the Institute." DN 119, ID 2135; DN 102-2, ID 1832. While the First Amendment does not necessarily bar a court from interpreting provisions of a church constitution in adjudicating a property dispute, *Jones*, 443 U.S. at 604, interpretation of article 113 appears to present First Amendment problems. A civil court may not properly resolve, under First Amendment principles, what is "in the interests" of a Catholic religious order – particularly since such interests necessarily implicate issues of canon law and religious doctrine.

In short, as the litigation moves forward, the district court should not permit either Plaintiffs or Defendants to entice the court to adjudicate issues related to the vow of poverty or religious doctrine. To the extent that Plaintiffs assert a defense based on religious doctrine, it should simply be disallowed under the circumstances of this case. *Maktab Tarighe Oveyssi Shah Maghsoudi*, 179 F.3d at 1250; *see also supra* at 39-40.

### ii. The District Court Can Resolve the Copyright Counterclaims Without Determination of Religious Doctrine

Fuller's copyright counterclaims can be adjudicated without implicating religious doctrine.

Courts have resolved copyright disputes involving religious works for nearly

100 years.  In *Order of St. Benedict v. Steinhauser*, 234 U.S. 640 (1914), the Supreme Court adjudicated whether the estate of a deceased member of a Catholic religious order or the religious order itself owned copyrights relating to the works of the member.  Effectively applying a neutral-principles approach, the Court stated that "[w]e are not concerned in the present case with any question of ecclesiastical requirement or monastic discipline.  The question is solely one of civil rights."  *Id.* at 642; *see also id.* at 648.  Since *Steinhauser*, courts have repeatedly applied neutral principles in the intellectual property context to resolve similar disputes.  *See, e.g.*, *Maktab Tarighe Oveyssi Shah Maghsoudi*, 179 F.3d at 1249 ("In determining whether the trademarks have been infringed, the district court can apply the regular factors that courts employ to determine infringement.  The defendants can raise neutral defenses . . . to the extent that they are applicable."); *Gen. Conference Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 408 (6th Cir. 2010) (stating that "the instant case can be resolved based on trademark law, without addressing any doctrinal issues"), *cert. denied*, — U.S. —, 131 S. Ct. 2097 (2011).

Plaintiffs here have themselves raised a range of civil defenses to copyright infringement.  *See, e.g.*, DN 125, ID 2312 (raising "public domain" and "fair use" defenses).  Such defenses can be resolved in cases involving religious works.  *See, e.g.*, *Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 44 (1st Cir. 2012) (undertaking public domain analysis in religious work case), *petition for cert. filed* (U.S. Nov. 26, 2012) (No. 12-7513).  The district court can also resolve under neutral principles rights to Neuzil's diary, *Self-Realization Fellowship Church*

*v. Ananda Church of Self-Realization*, 206 F.3d 1322, 1324, 1326-27 (9th Cir. 2000), whether the copyright was transferred to Fuller, *Soc'y of Holy Transfiguration Monastery*, 689 F.3d at 40-41, and whether the diary copyrighted in 1989 was a derivative work. *Id.* at 46.

In short, neutral principles of copyright law can be applied to resolve Fuller's copyright infringement counterclaims. *Cf. Gen. Conference Corp. of Seventh-Day Adventists*, 617 F.3d at 408 ("Plainly, the case can be resolved using the neutral principles of trademark law.").[40] Accordingly, Fuller's copyright counterclaims do not necessarily require interpretation of matters of religious doctrine or canon law.

## IV.    CONCLUSION

Based upon the foregoing, the issue of Fuller's religious status was determined by the competent ecclesiastical authorities over thirty years ago and that decision is not subject to review by a civil court. With regard to Plaintiffs' appeal of the denial of their motion to stay, the issue is moot given the recent decision of the Congregation for Divine Worship denying McCarthy's petition.  Finally, under the

_____

[40] There are other threshold issues with regard to Plaintiffs' attempt to introduce the vow of poverty issue into the copyright analysis, including the fact that the copyright was obtained long after Neuzil and Fuller had been dismissed from their religious order. DN 119, ID 2134.  In addition, Plaintiffs' standing to raise copyright ownership of the Sisters of the Precious Blood is unclear. *See Schnapper v. Foley*, 667 F.2d 102, 113 (D.C. Cir. 1981) (*jus tertii* standing denied in copyright case); *see also Soc'y of the Holy Transfiguration Monastery, Inc. v. Archbishop Gregory of Denver*, 685 F. Supp. 2d 217, 229 n.17 (D. Mass. 2010) *aff'd sub nom. Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29 (1st Cir. 2012).  Finally, as set forth above with regard to the counterclaims related to the crucifix and plaque, a civil court cannot resolve doctrinal disputes relating to the vow of poverty. *See supra* at 47-48.

specific circumstances of the case, the property claims and counterclaims do not require determination of religious doctrine and can be resolved applying neutral principles of law.

Respectfully submitted,

/s/ Jeffrey S. Lena

Jeffrey S. Lena
jlena@sbcglobal.net
LAW OFFICE OF JEFFREY S. LENA
1152 Keith Avenue
Berkeley, California 94708
(510) 665-1713

Alexis Haller
ahaller@ahlawoffice.com
LAW OFFICE OF ALEXIS HALLER
14241 NE Woodinville-Duvall Rd., #113
Woodinville, Washington 98072
(425) 487-0730

Byron H. Done
byron.done@sbcglobal.net
LAW OFFICE OF BYRON H. DONE
1640 10th Avenue
San Francisco, California 94122
(925) 518-0449

Counsel for the Holy See
(*without waiver of sovereign immunity or other jurisdictional immunities*)

## V.     CERTIFICATE OF COMPLIANCE

I certify that pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Seventh Circuit Rule 32, the attached *amicus* brief is:

  X    Proportionately spaced, has a typeface of 12 points or more, and contains 13,719 words.

 /s/ Jeffrey S. Lena
Jeffrey S. Lena

## CERTIFICATE OF SERVICE

I, Byron H. Done, hereby certify that I electronically filed the foregoing brief with the Court via the appellate CM/ECF system this 17th day of January, 2013. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

 /s/ Byron H. Done
Byron H. Done